Good morning. May it please the court, counsel. Plaintiff Appellant in this case is a small, independent magazine publisher that seeks to distribute copies of a magazine called Chicago Baseball, which contains news, satire, criticism, and analysis about the Chicago Cubs on the public sidewalks immediately adjacent to Wrigley Field before and during Chicago Cubs' home games. Left Field Media has done so, and the magazine has been distributed in this manner for nearly 20 years without posing any problems to the city of Chicago and without any substantial interference in those activities by the city of Chicago. But now, beginning in the 2015 Chicago Cubs season, the city has sought to enforce two ordinances to restrict the appellant's activities. First, what we have referred to as the adjacent sidewalks ordinance, which bars all pedaling on the public sidewalks immediately adjacent to Wrigley Field. And second, what we've referred to as the peddler's license ordinance, which requires each individual vendor who would seek to sell Chicago Baseball magazine to first obtain a $100 per person license from the city of Chicago before selling or distributing the magazine on the public sidewalks. Plaintiff appellant has sought a preliminary injunction barring enforcement of both of these statutes. There are three reasons why the district court's decision denying that preliminary injunction ought to be overturned. First, the adjacent sidewalks ordinance is not a reasonable time, place, and manner regulation of speech. Second, the peddler's license ordinance is an unlawful prior restraint on the plaintiff's speech. And third, both ordinances are unlawful content-based regulations on speech because they exempt newspapers from their regulations, but apply to all other mediums of communication, including books, magazines, pamphlets, and newsletters. Counsel, would your claim be resolved if the city simply removed the exception for newspapers? No, Your Honor. We believe that barring peddling of pure speech material such as Plaintiff's Magazine is unlawful under the First Amendment on the traditional public forum of the public sidewalks adjacent to Wrigley Field. So the newspaper exemption does make the regulation content-based, but also if the regulation is analyzed as a time, place, and manner regulation of speech. It regulates the time, place, and manner of commercial activity, right? No, Your Honor. The Supreme Court has explained that commercial speech is speech that does no more than propose a commercial transaction. This applies to hot dogs, hats, any tangible personal property, right? Correct, Your Honor. And does not apply to anything that's not sold. Anything can be given away or said. So as my colleague said, this applies to commercial activity, not speech. So why should we treat it as if it were a regulation of speech? Yes, so I think there are three reasons why the no peddling zone should not be seen as a content-neutral regulation of conduct rather than speech. First, the right to distribute is a fundamental component of freedom of speech. The Supreme Court held in Lovell v. City of Griffin that liberty of circulating is as essential to the right of freedom of expression as liberty of publishing. Indeed, without the circulation, the publication would be of little value. So how does this apply to zoning of bookstores? Are they entitled to set up in residential neighborhoods? Well, there's a fundamental distinction here where in this case we're talking about a traditional public forum where the rights I'm trying to, look, we can change hypotheticals here a great deal. What I'm trying to understand, though, is the logic of your position saying that your commercial distribution of this magazine is exempt from otherwise general laws governing commercial activity. Yes. So how about a bookstore that wants to locate independently of zoning ordinances? Plaintiff does not have a quarrel here with the idea that generally applicable content-neutral regulations of business and commercial activity can be applied to its activities. The plaintiff has a state of Illinois business tax ID number. So let's go back to my first question. If newspapers were no longer exempt from these restrictions, would you have a complaint? Yes. I thought you just told me that you don't object to generally applicable commercial regulations. Well, the distinction here is that the activity the plaintiff seeks to engage in on the public way is pure speech. So why don't you give a different answer to my colleague's question about bookstores where somebody is doing nothing but selling books, publications, and other speech? I think the fundamental distinction here is that we are talking about a traditional public forum, a public sidewalk, not a zoning regulation that applies to regulate where businesses may be located. This is a regulation of where people can do something. That's what zoning laws also do. Correct. The difference is that the statute at issue here limits plaintiff's ability to engage and express them. When the Supreme Court was writing about speech in a public forum, the cases it's about are cases of pure speech, that is, standing up and saying something. They aren't standing up and selling something. Correct, Your Honor. I have two responses to that inquiry. First, it is true that left-field media could avoid application of this no-peddling zone to its distribution of the magazine. I'm not really asking, nor is my colleague, about left-field media. We're asking about general principles of constitutional law. Is there any general principle that says that somebody who wants to sell printed matter is exempt from normal commercial regulation? Well, Your Honor. You've already conceded the answer is no for bookstores. I don't see why you are now saying that the answer is yes, provided you're on your feet. I think the difference is the special character of the forum at issue here. So anyone could hand out something for free on a public forum under the city's regulations. That's true. And anyone could simply stand there and shout their message to passersby. However, the statute at issue here would then... And I take it you're conceding that your client can't build a kiosk on the sidewalk outside of Wrigley Field. That's correct. You're not asking us to overrule Graff. Correct. And all plaintiff's vendors are mobile. They carry the magazine in a shoulder bag, and they are able to move out of the way of anyone who poses a... Of course, if you move out of the way of A, you're moving into the way of B. On a crowded sidewalk, there's just a limited amount of space. That's, of course, true, and any pedestrian who's... So why don't you say you're entitled to build a kiosk the size of a person with a shoulder bag? Well, there's a big difference between an immobile kiosk that takes up... There isn't a big difference. If the street is wide enough to hold three people abreast and your client is one of those three, that's the same thing as building an immobile kiosk. It reduces the width of the street from three to two. Actually, maybe to one because you also have a customer. Yeah. Well, here the plaintiff's vendors are always willing to move if asked to do so or if there's any... Pardon? Onto the street. Or just to another area of the sidewalk. Of course, that might be illegal to move onto the street. There's traffic. Well, it depends on... It's very slow near Wrigley Field, but there is traffic. On game days, actually, the public streets are actually frequently closed to vehicular traffic for exactly that reason. So depending on the situation... Then it's really slow. Right, for all of us. But I think that to the court's point about the plaintiff's ability to hand out a free magazine or communicate its message in any kind of free way, I think that the issue is that this would result in economic favoritism to those who can afford to produce a publication that they can give away for free, which is not the position that the plaintiff is in and not the position that many others are in. So the time-honored purpose of the public forum doctrine is to protect the rights of the poor, the marginalized, and those of less means. Right. What that means, though, is you're telling us that commercial activity cannot be regulated by general rules, at least applicable to expressive activity, right? I don't know that it's that broad. I mean, certainly there is an expressive component to running a Borders bookstore, but a Borders bookstore is not located on a public forum. Now, the city's regulations would apply even to a lone publisher who prints a track that he wants to sell for 50 cents per copy to passersby. Under the city's ordinance, that person would be prohibited from engaging in that activity on the sidewalks adjacent to Wrigley Field. And I think that upholding such a regulation would really run contrary to other decisions of this court in cases like Harina v. Granite City and Martin v. Struthers, in which the court emphasized the importance of protecting and upholding inexpensive means of distributing messages that are available to those who don't have the economic means to give away their publication for free or to publish a book, a newspaper, or something more official. Ms. Nicholas, could I ask you, in your brief, you indicate that the Cubs have mobile program vendors working the same sidewalks we have here? That is correct, Your Honor. The evidence in this case shows that Chicago Cubs employees are allowed to engage in commercial activity in many ways on these sidewalks. One, they sell their own program, both mobile vendors and from kiosks that they've set up. Two, they have raffle ticket salespeople who regularly use... I think on the videos I also saw some people selling peanuts and Cracker Jacks or something like that. But what I didn't really see in your brief is a discrimination claim for, in essence, viewpoint discrimination. Well, I think that underlying the city's imposition of this regulation is perhaps a desire to benefit the economically powerful interests of the Chicago Cubs organization. Well, that's interesting. Look, we know that the city can't allow the distribution of Democratic propaganda and prohibit Republican propaganda, right? Correct. And I would assume the same rule would apply to pro-Cubs management leaflets and anti-Cubs management leaflets, right? Correct. But I don't see that argument, really. You seem to be trying to reach a much broader conclusion here where this could not be solved by simply enforcing the peddling regulation against everybody, your clients and the Cubs folks. Well, that's true, that the city does not enforce this regulation as to the Cubs. But there's also a lot of other activities that the city doesn't regulate on these sidewalks. For instance, one can preach, one can distribute free materials, one can protest. And I think that this goes to the legitimacy... Of course, we've seen that argument a lot. The Supreme Court has said that Hare Krishnas can proselytize in airports but not sell merchandise there. The city has drawn the same distinction between selling and giving that the Supreme Court has drawn. Why does that make it bad? Has the Supreme Court violated the First Amendment? No, Your Honor. Lee was a case involving an airport terminal, which is not a traditional public forum like the public sidewalk at issue here. So the special protection that speech is entitled to when you're dealing with a traditional public forum like we are here is different than that. No, we're talking about commercial activity, right? The Supreme Court has explained that a communication does not lose its First Amendment protection simply because it's sold rather than given away. Of course, the Supreme Court says a lot of things in very broad terms. We're trying to... Let me put it this way. What regulations do you think would be permissible for the sale of expressive content on the sidewalks of a city like Chicago? Well, there are numerous regulations that are already in place with which the plaintiff in this matter has no quarrel. For instance, the generally applicable rules against disorderly conduct, statutes that specifically bar obstruction of the sidewalks, statutes that require people who are selling merchandise... You're aware that the Supreme Court has held unconstitutional under the First Amendment general laws against disorderly conduct. It says they're just invitations to content discrimination. So what you want the city to do is what the Supreme Court has said it's forbidden to do, whereas you want the city forbidden to do the kind of thing, general regulation, that the Supreme Court allows. Sounds topsy-turvy to me. Well, the city of Chicago has quite narrowly defined disorderly conduct with a series of subsections, a few of which we think would apply to sales of a magazine or a book on the public way. For instance, it defines as disorderly conduct an individual blocking ingress or egress to a commercial establishment. That is a specific subsection of the disorderly conduct statute that we think could be applied to regulate plaintiffs and others' activities. The city has roughly concluded that that's just true of everybody trying to sell things on the sidewalk outside Wrigley Field. I'm sorry, the city has concluded... That's what this ordinance represents. It represents a decision that it blocks ingress and egress for anybody to sell anything on that sidewalk. Well, what I think is missing from the city's analysis is any objective evidence that that is true. The whole idea in your brief, too, seems to be let's make First Amendment analysis entirely subjective, resting on the discretion of the officer on the beat. If the Supreme Court has disapproved anything in the First Amendment world, it's that. Correct, Your Honor. I see I'm going into my rebuttal time. If I can just briefly respond to your point, it's simply that there should be statutes in place that target the harms allegedly caused by speech. Here, it is a statute banning the speech itself, which the Supreme Court... No, it's not. It's banning... It's banning the sale of product. Correct, which this court has observed in Weinberg was an inseparable part of the expression that was at issue. I'm glad you mentioned Weinberg, because it looks to me like the city just took advice from the panel opinion in Weinberg here by banning peddling on sidewalks immediately surrounding the stadium, right? Well, the decision in Weinberg, the discussion of perhaps a statute that was more narrowly tailored might pass constitutional muster. Such a statute was not actually analyzed in Weinberg. It was simply observed that a 1,000-foot ban around the stadium was unconstitutional. I'll reserve the remainder of my time. Thank you. Thank you. Mr. Breyer. Good morning, and may it please the court. I apologize. I'm losing my voice this morning, so this court should... It might get worse in the next 20 minutes. I'll have to think about that later. This court should affirm the Wrigley Ordinance, the ordinance prohibiting the peddling of goods on the two remaining public sidewalks immediately adjacent to Wrigley Field is a content-neutral time, place, and manner restriction. Well, one of the hints, I think it's probably no more than a hint in Left Field's brief, is that the city seems perfectly content with people other than Left Field selling things on the sidewalk. And if that's so, don't we have a real discrimination problem? Were that the case, that might be a problem, but that isn't the case here. I don't see any findings by the district court about whether people such as the Cubs, other than Left Field, are allowed to sell printed matter on the street outside Wrigley Field. I believe the district court discussed some problems, and this is definitely present in the testimony of Sergeant Hitterus, that there are individuals who are engaging in other activities, but this is page 30 and 31 of his testimony. The allegation, maybe it's not supported by the record, Left Field's allegation is that the Cubs in particular are allowed to sell their programs on these streets, and Left Field is not. If that's true, I don't know whether the record supports it, doesn't that give you a problem? That would possibly give a problem, but it is not supported by the record. Sergeant Hitterus, when this issue was brought up during the preliminary injunction hearing, the testimony was specifically that whatever activity was allowed was on Cubs' private property, and the Wrigley ordinance does not apply to that. Do we have any findings by the district judge? There were no findings of, that would tie into the content neutrality issue, or viewpoint discrimination perhaps, but there were no findings going the other direction. The district court simply found that there was no content discrimination here, but the record wouldn't support such a finding in the first place. Was that how the issue was framed for the district court, in terms of viewpoint discrimination, if I can go back to what now seems like an obsolete term? It does not appear to have been the way this issue was framed. It was that there was a question of content neutrality of this ordinance on its face, or in its justification, but there's no such content-based reasoning at the heart of this ordinance. The ordinance is plain on its face that any peddling is prohibited. Presumably, we could agree that if there were a pattern of discriminatory enforcement, that's the kind of thing that the district court could try to remedy, correct? Of course, yes. I see some indications in the evidence that maybe that's true, but no real pursuit of that theory, and no real findings on the issue. I don't believe that issue is pursued at all, but it would not be supported by the record. The record indicates that when the Cubs are staying on their own private property, where the Wrigley Ordinance just doesn't apply, that turns into an issue of trespass. And there were some concerns about trespass. After the TRO was entered, for instance, some of Left Field's vendors ventured onto Cubs' property, and they were just instructed to move along. How do you tell where the Cubs' property starts here? I was watching the videos. Turn the corner onto Waveland. Unfortunately, that's proven somewhat difficult. Sergeant Hedris testified that generally they apply a six-foot rule, that they feel safe six foot away from the Cubs, the Wrigley Field outer wall, that that's comfortably within the Cubs' property. But that was an issue for the, again, another issue that is faced by the officers trying to enforce that. They paint pictures of Ernie Banks on everything they own. That might be an interesting way to get around the problem. But at the end of the day, there's no content discrimination here, and there's certainly no viewpoint discrimination here. There's no difference between pro-Cubs and anti-Cubs viewpoints. Let's move on to the other ordinance, which wasn't mentioned so far. That's the License Ordinance. I find it pretty hard to justify licensing of speech. And in particular, the city wants to make its license contingent on paying back taxes and paying back child support and paying $100. Has the Supreme Court ever sustained a license on speech that's contingent on such things? Regarding the payment of the fee, that is well settled, that fees charged solely for the purpose of administrating. But this doesn't have just fees charged to cover the cost of administration. $100 seems high to cover the cost of administration, but forget about that. There are all sorts of other things. Suppose the city passed a law saying you cannot distribute a newspaper if you are behind in your child support obligations, period. Would that be okay under the First Amendment? That might raise First Amendment concerns, but that's, again, not what the city... You cannot distribute a newspaper if you are behind in your taxes. You cannot distribute a newspaper if you have any unpaid parking tickets. These strike me as screamingly invalid laws, but isn't that what this says? That is not what this says, Your Honor. Oh, because it's got a newspaper exemption. Every other kind of printed speech, you have to be current in your parking tickets. No, that's not because, as we explained in our brief, the ordinance isn't so harsh that if you get a parking ticket, you immediately lose your license. No, it takes a couple of weeks until it goes into arrears. But if you're in negotiations, if you've entered into a payment plan... This is quibbling. The basic rule is in order to sell printed matter, you have to be current on your taxes, current on your parking tickets, current on your child support, and a few other things. Specifically, this ordinance says that if you refuse to pay, if you refuse to even try to pay... That's what it means to be current. Not exactly. If you've paid up, then you're current. This is quibbling. But... You've already conceded, it seems to me, the basic rule that the First Amendment does not permit a city to condition the sale of printed material on paying timely taxes, paying timely parking tickets. We can have a fight about what it means to be current on your taxes, but the basic rule seems clear, and it seems... Well, this ordinance is highly problematic, given that rule. We would disagree, but there's also the issue of standing. Particularly, I think dead on point is the Supreme Court's decision in FWPBS, where an individual is challenging on First Amendment grounds a licensing scheme that contains certain exemptions that prohibited certain individuals from obtaining a license. And the Supreme Court specifically held that there was no standing by the plaintiff. The plaintiff had no standing to challenge those provisions, because they weren't affected by those provisions. And that's exactly what we have here. Leftfield has never at any point complained that these provisions in any way prevented it from obtaining a license. It never tried to, but we'll set that aside. It's never said that if it sent its entire team of vendors to the city, that a single one has or fears having any unpaid obligations, any unpaid taxes, any unpaid child support. And under FWPBS versus City of Dallas, that means they have no standing. Maybe some individual in the future might, but these plaintiffs do not. And that's the end of the inquiry, as far as constitutional standing is concerned. Why can't a business buy a license that is transferable among a workforce that has a high turnover? The problem is the specific interests that underlie this ordinance. The point is that these individuals will have identification. So a person buying from that person not only has a reassurance from the city that there is a way to address misconduct. We don't have to say extreme misconduct. It could be as bad as fraud. It could be merely, I bought the wrong size T-shirt. So people are threatened then by someone who didn't pay their taxes selling them things? I apologize. I believe that was a different concern about the exchangeability of licenses. But I don't believe that that has any relation to the tax concern. I was speaking to the concern of fraud, that individuals, consumer fraud, consumer misconduct, things of that nature, are why these licenses can't be transferred. We would not say that the unpaid taxes goes to that. No. Let me follow up on my colleague's question. Who owes the sales tax? Leftfield Media or the vendor, the employee? The sales tax for the items being sold? Yeah. Leftfield Media sells something. It costs $2. Presumably has to collect $2.16.75 or something like that and remit the $.16.75. Who owes the sales tax? My understanding would be that Leftfield would owe that sales tax, not the individual. That reinforces the question. Why is it that the vendor who is licensed rather than the person who owes the sales tax who is licensed? You issue a license. Everybody would have a little tag that says Leftfield Media and the police, if they were minded, could count how many magazines are being sold, multiply that by $.16, and see whether the tax is remitted. It's very hard to see how licensing the particular person, like licensing the sales counter clerk at a bookstore, is helping to collect the tax. I believe that the requirement of individual licensing isn't as compelling for the taxes, but that isn't the only interest that's being advanced by the licensing requirement. It's the fact that these licenses, these badges, are being issued to individuals on the street engaging in face-to-face transactions with customers, and that those customers… You're dealing with people inside where you're asking things like, where can I find a book telling me about a sensible diet? Correct. And they might mislead you. In fact, almost any book about a diet will mislead you. Right? But those people aren't licensed. They aren't licensed, but they also aren't these itinerant individuals wandering the streets the same way, that you can go back to the facility and you can say, I've dealt with a bookstore, for instance, buying a diet book. I could understand an argument that everybody who sells something needs to wear a name tag saying who he's working for. And if he's working for himself, maybe he needs to get a business license, just as almost every other business needs a license of some kind. But that would justify having everybody with a tag that said left-field media, blame left-field media, collect taxes from left-field media. That's not what this ordinance does. That's one of the things that worries me about it. But the issue here is whether that has some sort of substantial impact on speech, whether that requirement that these individuals pay $100 every two years, $100 that can be paid by the employer itself, whether that reduces in any extent, let alone a substantial extent, the amount of speech. For starters, there's a question, as this panel has observed, whether these individuals making sales are engaged in speech rather than conduct. But setting that aside, how does this requirement prevent the speech from being made in the first place? And left-field really hasn't explained that. They don't want to pay the $100. But how is that keeping them from speaking? How is that limiting the number of people on the streets that are speaking? And that just isn't here. There isn't anything in the record I'm aware of that people are turning away from. Left-field media must be incredibly lucky in being able to find a workforce that doesn't have unpaid parking tickets. From the record, they've made no claim. They didn't even address this issue at the preliminary injunction hearing. It only came up when they objected to the magistrate's report and recommendation. So there's not even a developed record on that point, but there's certainly no evidence that would show they have a problem with it. Every three or four years, the Chicago Tribune runs an article calculating what percentage of the city's own workforce has unpaid parking tickets and back child support. How could left-field media be better than the city of Chicago at hiring people who are fully paid up on parking tickets? If they aren't, they haven't offered any evidence, and that's what the district court had to rely on. Maybe there's a shortfall of evidence, but some of these contentions just seem very difficult to understand. Mr. Breyer, this is a case that presents lots and lots of interesting questions under the First Amendment. We're here on an appeal from a denial of a preliminary injunction, correct? Correct. If I understand the status of the case, it was presented in a certain form, certain arguments, certain records, and that doesn't necessarily answer all the questions that we might have. I don't see anything that would prevent further exploration of some of these other issues with respect to a permanent injunction request, regardless of what we do with the preliminary injunction. Do you? No, and there were unfortunately some issues with the presentation of the evidence during the preliminary injunction hearing. For instance, one of the defendants sadly had a stroke in the midst of his testimony. In the midst of his testimony? I think it was, as I understood it, there was a recess and he had a stroke during the night or in the interim. So unfortunately, there are some issues that would actually recommend that there may be development. I don't know his status. There are some issues of his medical status, obviously, given his stroke. But again, there's nothing to prevent, if he makes a recovery, the district court from further considering what was going on. And that seems particularly relevant to the question of this court's concerns about whether there was some unlawful viewpoint discrimination between the Cubs and everybody else. That was the officer that issued the ticket here. But again, just to double back, there's nothing to bar further consideration as far as a permanent injunction is concerned. Do we know what changed last spring? At least the record seems to indicate that left field had been distributing, perhaps legally, perhaps illegally, but distributing for 18, 19 years. And then suddenly on opening day last year, the city got excited about enforcing this. Do we know what happened? Again, that was the officer that, unfortunately, had the stroke. But there's nothing to indicate that there was some outcry about what left field is saying, that there's no evidence that the Cubs had any concerns, there's no evidence that the city found what left field was doing, or the officers or anybody, for that matter, found offensive. The most that the record shows is that there was a question that the officers wanted to resolve as far as the First Amendment concerned. I believe a year prior to the issue of the citation, they had been discussing among themselves what their status was, how to proceed in the most lawful manner possible. But there's nothing to show that there was some sudden change. It's just the enforcement of the ordinance that had been in place since 2006 without incident. That had been enforced regularly around since that time, according to the record, without incident. Just doubling back, just concerning this newspaper exception, left field has insisted throughout this litigation that the Wrigley Ordinance contains a newspaper exception. It simply does not. The Wrigley Ordinance is plain on its face that no peddling of any kind, newspapers or what have you, is allowed. And that isn't content discrimination anyway. There's no specific content in a newspaper versus any other thing. It's just a form of transmittal. And under Turner v. FCC, even if that restricts, restrictions of forms of communication aren't problematic unless there's somewhere buried in them a viewpoint or content-based discrimination. And there's just none here. If left field printed a newspaper that was praising the Cubs, it would still be just as prohibited here as it would be were it, as left field's magazine currently does, is much more critical of the Cubs. If this panel has no further questions, we respectfully request that you affirm and remand this matter for further consideration of the permanent injunction. Thank you. Thank you, Mr. Barber. Anything further? Ms. Nicklaus? Thank you, Your Honors. There was some implication by the city's attorney and by certain city witnesses during the preliminary injunction hearing that the activities of Cubs vendors, such as selling raffle tickets or selling their own program, was occurring only on Cubs property or with the Cubs organization's permission. I think it is very important to look at the text of the statute that is at issue here, which actually applies to the entirety of the pedestrian way, extending from, quote, the perimeter of the stadium structure to the curb line. So the city's ordinance applies to sales occurring anywhere there, and whether it is a clear line of what's the public sidewalk versus what is the Cubs property, their ordinance is only being applied to the activities of people other than the Cubs. Secondly, I want to just respond briefly to the city's contentions concerning the plaintiff's standing to challenge this activity, the licensing ordinance. As this court has just observed, Leftfield's ability to distribute its message is hinged upon the availability of vendors who can obtain an individual license from the city. And individual vendors must each go downtown, each fill out an application, each provide satisfactory proof that they do not have debts owed to the state or to the city, and then must pay $100 and obtain this license. If an individual is not able to obtain a license under those circumstances, Leftfield is prohibited from... Have they tried? No. Up to this point, the city has not sought to enforce the licensing provision against Leftfield vendors. And wait a minute. So the city hasn't tried to enforce it. You all haven't tried to comply with it. Why are we debating it? Well, because now the city has indicated that it intends to enforce the licensing provision as to Leftfield's vendors. For the first time. Again, this ordinance has been in place throughout Leftfield's existence and throughout the existence of Chicago Baseball Magazine, and it was only at the beginning of the 2015 season that the city sought to enforce the licensing provision for the first time. So I see I'm out of time. And we ask that the court reverse the decision denying plaintiff's motion for a preliminary injunction. Thank you. Thank you very much. Counsel, the case is taken under advisement.